UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 20-250 (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IVAN HARRISON HUNTER,<br><br>Defendant. | GOVERNMENT'S POSITION ON SENTENCING |

___

*"I am openly calling for a Second Revolutionary War."* Defendant's post on Facebook – December 9, 2019.

*"We could raid the Coast Guard armory in port A(ransas) )[1]… "I'll throw the first cocktail if I have to."* Defendant's group message to Boogaloo Bois – January 1, 2020.

*"Go for police buildings"* Defendant's message to another Boogaloo Bois in California – May 28, 2020.

*"We need to riot."* Defendant's post on Facebook – June 4, 2020.

The United States of America, through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Assistant United States Attorney Andrew R. Winter, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, §

---

[1] Port Aransas is a city on Mustang Island, on the Texas coast and is home to Station Port Aransas, a facility maintained by the United States Coast Guard.

3553(a), the United States believes that a sentence of 52 months' imprisonment, followed by three (3) years of supervised release, is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

I. INTRODUCTION

On September 30, 2021, Defendant Ivan Harrison Hunter ("Defendant") pled guilty without a plea agreement to Riot in violation of 18 U.S.C. § 2101(a). Presentence Report ("PSR"), ¶ 1. The facts show that Defendant travelled from Texas to Minnesota with the intent to participate in the riots unfolding in the Twin Cities. Within hours of arriving in Minneapolis, Defendant met up with members of an anarchist movement, obtained an AK-47 assault rifle, then blindly fired 13 rounds into the entryway of the Third Precinct Building of the Minneapolis Police Department. He then immediately returned to Texas. Though Defendant now claims he was motivated by a desire to "deescalate conflict," his conduct and statements made before, during, and after his crime demonstrate that he was motivated exclusively by an extremist ideology bent on fomenting violent civil unrest. A guideline analysis and an examination of the factors set forth in 18 U.S.C. § 3553(a) leads to a recommendation of an upward variance to a term of 52 months imprisonment followed by three years of supervised release.

II. FACTS

Defendant joined the Boogaloo Bois ("BB") in 2019. PSR, ¶ 13. Members of this violent extremist movement have varying viewpoints, but their ideologies coalesce around the perceived overreach of government authorities – especially as it pertains to the possession of firearms. PSR, ¶ 9. Defendant has told Probation that he joined the movement

after a man in New York surrendered firearms to local authorities under that state's 'red flag' law. Defendant explained that he was upset because he viewed this as an attack on the Constitution. PSR, ¶ 59. After joining the BBs, he promptly became their self-professed leader in South Texas and, through his affiliation with the BB, joined the "Happy Friends Group." According to Defendant, the "Happy Friends Group" was a "fire team" that would react with violence if police attempted to take their firearms. PSR, ¶ 19. From late 2019 and on, Defendant's conduct and statements evidenced his commitment to this extremist ideology:

> **December 9, 2019**: Defendant posted, *"I am openly calling for a Second Revolutionary War."*
>
> **January 1, 2020**: *"We could raid the coast guard armory in port A(ransas)*[2]*... "I'll throw the fist [sic] cocktail if I have to"*
>
> **February 20, 2020**: *"I run a small militia called 'happy friends group' and would gladly die so that others may live love and worship freely, without fear of repression or tyranny!"*
>
> **March 14, 2020**: Defendant sent BB member Steven Carillo[3] the following message: "*Start drafting that op. The one we talked about in December. I'ma green light some shit.*" Carillo responded, "*Sounds good, bro!*"
>
> **May 25, 2020**: George Floyd is murdered in Minneapolis.

---

[2] Port Aransas is a city on Mustang Island, on the Texas coast and is home to Station Port Aransas, a facility maintained by the United States Coast Guard.

[3] Carrillo, discussed in detail below, pled guilty to the May 29, 2020, murder of a Federal Protective Service Officer in Oakland, California. Carrillo is pending trial for the June 6, 2020 murder of a Santa Cruz County Sheriff's Deputy. Both victims were members of law enforcement and were murdered in ambush-style killings with homemade AR-15.

**May 26, 2020**: BB member Michael Solomon ("Solomon"), posted on Facebook: "*I need a headcount. If you have keybase[4] message me on there 'bigboogboi' if not [private message] me.*"

**May 27, 2020**: At 4:30 p.m., Defendant reports to Solomon: "*72 hours out*" and *"can you give me any confirmation of KIAs* [killed in action]?" PSR, ¶ 10. Benjamin Ryan Teeter ("Teeter"), a resident of North Carolina and fellow BB member, posted on Facebook: "*Lock and load boys. Boog flags are in the air, and the national network is going off.*" *Id.* Defendant communicated with Teeter as both departed their respective states for the Twin Cities. At 7:12 p.m., Teeter messaged Defendant: "*We're still in route. Once we arrive we're going to get a central command established and primary and secondary comms channels.*" *Id.*

**May 28, 2020**: Solomon messaged Defendant, "*Rally point will be Cub (Foods) at 6…The Cub by the 3rd precinct in Minneapolis.*" Defendant replied, *"We have a team of 5."* At 10:30 p.m., Defendant messaged his precise GPS location to Solomon, which was two blocks from the Third Precinct building. Solomon replied to Defendant, "*2 min, you'll hear my truck.*" PSR, ¶ 12.

By 9:00 p.m. on May 28, 2020, individuals climbed the surrounding fencing and breached the entrances to the Third Precinct building. Nearby structures, including a pawn shop, liquor store, and auto parts store, were burning, and social media exchanges began to include instructions on making incendiary devices, such as Molotov cocktails. PSR, ¶ 11. Around 9:30 p.m., the remaining MPD officers at the Third Precinct were told to leave as the crowd, by some estimates more than thousand people, became increasingly uncontrollable and began to approach and surround the back gate of the precinct's parking lot. Shortly before 10:00 p.m., a squad car drove through the back gate, locked from the outside, to allow fellow officers to retreat on foot. PSR, ¶ 11. Minutes later, two men

---

[4] "Keybase" is a secure messaging and file sharing service that utilizes end-to-end encryption.

4

entered MPD's Third Precinct building with Molotov cocktails and set the building on fire.[5]

Agents recovered a cell phone video[6] that depicted the next sequence of events. The video shows Defendant – amidst the chaos on the street – walking up to a door to the Third Precinct building and discharging thirteen (13) rounds from an AK-47 style semiautomatic rifle directly into one of the entryways into the structure:



The video also demonstrates that the lights were on inside on both the first and second floors of the precinct building. After emptying his magazine, Defendant marched towards the camera, high-fived an individual, then yelled, "justice for Floyd!" PSR, ¶ 13. The

---

[5] The structure was damaged from the fire, looting, and gun shots. On February 17, 2022, the undersigned spoke to representatives from the City of Minneapolis who confirmed they will, prior to sentencing, submit a victim impact statement as well as documents supporting a restitution claim for damage done to the Third Precinct building.

[6] The government will offer to play the video (Sentencing Exhibit 1) during the sentencing hearing.

following photograph shows the bullet holes left in the entryway[7] and demonstrates that the entire entrance had been obscured, eliminating a person's view into the structure:



After he shot at the Third Precinct building, Defendant and his fellow BBs proceeded to the Cub Foods store at Lake St. and Hiawatha Ave. South where they posed for the following photograph, which shows Defendant, second from the right, holding his rifle across his chest, and wearing the skull mask over the lower half of his face:

---

[7] Discharged casings were recovered from this area and, when later tested, were found to match an AK-47 found in Solomon's house. Sentencing Exhibit 2 is an itemized account of the damage to the Third Precinct building resulting from the shots fired by Defendant. This has been provided to the Court and parties by the City of Minneapolis' Finance and Property Services office to aid in determining restitution in this case.

6



Hours after posing in front of the Cub Foods store and shooting at the Third Precinct building, Defendant and Teeter took the following 'selfies' at a hotel room. Teeter then posted these images on his Facebook account:

 

By the early morning hours of May 29, 2020, Defendant left the Twin Cities for Texas. After arriving home, Defendant received a message from Teeter telling him they were now "battle buddies." Defendant then boasted about his criminal behavior on social media. For example, on May 30, Defendant messaged another individual stating, "*I set fire to that precinct with the black community*" followed by a clarifying message: "*Minneapolis third*

7

*precinct.*" The next day, Defendant messaged another individual: "*My mom would call the fbi if she knew what I do and at the level I'm at w[ith] it.*" Accompanying this statement, Defendant posted photographs of an AK-47 style assault rifle. Then on June 2, 2020, Defendant posted messages on Facebook stating, "*Protesters shoot back*" and "*[to be honest] I don't expect to be here next year.*"

On June 3, Defendant attended a Floyd protest near Austin, Texas. At approximately 2:00 a.m., Austin Police Department ("APD") officers observed Defendant and two other men outfitted in tactical gear and carrying rifles. After the driver of their car committed a series of traffic violations, APD officers stopped the vehicle. Defendant – the front seat passenger – claimed ownership of marijuana that was visible in plain view. Officers noted Defendant had six loaded magazines for an AK-47 style assault rifle affixed to his tactical vest while the two other men each had AR-15 magazines affixed to theirs. Officers found an AK-47 style rifle and two AR-15 rifles on the rear seat of the vehicle plus one pistol in plain view next to the driver's seat and a second pistol in the center console. Defendant volunteered that he was the leader of the BB movement in South Texas and that he was present in Minneapolis when the Third Precinct was set on fire. PSR, ¶ 16. Below is a photograph of the loaded magazines on Defendant's person on June 3rd:



One day after his encounter with APD, Defendant posted "*we need to riot*" on his Facebook account.

<u>Defendant's Affiliation and Communication with BB Member Steven Carillo</u>

Shortly after the June 3 Austin traffic stop, agents in Texas became aware of Defendant's affiliation with BB member Steven Carrillo (Carillo). Carillo is charged in two separate murders of members of law enforcement committed on the heels of the riots in Minneapolis. One day after Defendant fired his AK-47 into the Third Precinct building, Carillo used a homemade AR-15 to gun down Pat Underwood, a Federal Protective Service ("FPS") Officer on duty at the Ronald V. Dellums Federal Building and U.S. Courthouse in Oakland, California. Carillo recently pleaded guilty to this murder and acknowledged in court that he "actively discussed and encouraged violence against law enforcement" online and that he "aligned [himself] with an anti-government group" known at the Boogaloo Bois.[8]

---

[8] https://www.santacruzsentinel.com/2022/02/11/ex-air-force-sergeant-with-boogaloo-militia-ties-pleads-guilty-to-killing-oakland-federal-court-officer-3/

Carrillo has also been charged in the June 6, 2020, murder of a Santa Cruz County Sheriff's Deputy in California. Like FPS Officer Pat Underwood, Dep. Damon Gutzwiller was shot to death in an ambush-style killing that left three other officers injured. The same AR-15 used to kill Underwood was recovered from Carillo during this second attack and near where Carillo was apprehended, officers found the word "Boog" and the phrase "I became unreasonable" written in blood on a vehicle.[9]

While Carillo's crimes are not at issue in this sentencing, Defendant's communication and ideological affiliation with Carillo illuminates his state of mind at the time Defendant shot at the Third Precinct building. In his statement to Probation, Defendant has taken the self-serving and grandiose position that he is a protector of the Constitution (PSR, ¶ 23), a "respected member of a civil rights group" (PSR, ¶ 24), and that he was motivated by a desire to "protect the rights and safety of the peaceful protesters" and to "deescalate any conflicts" between police and protesters. PSR, ¶ 25. Stretching this fiction even further, Defendant claimed he was "inspired by the opposing gang members, antifa, and other groups coming together to fight for the resurrection of their community" (*Id.*) – something he was purportedly able to discern after spending one day in Minneapolis. Adding to this absurdity, Defendant told Probation that before firing into the building, he "used firearm safety checks" before emptying his magazine into it. PSR, ¶ 26. His conduct in this case, he told Probation, was neither reckless nor negligent. *Id.*

---

[9] https://www.nbcnews.com/news/us-news/man-charged-deputy-ambush-scrawled-extremist-boogaloo-phrases-blood-n1230321

Further contradicting Defendant's flawed narrative is the evidence to be found in Defendant and Carrillo's communications before, during, and after the Third Precinct shooting and the murders of law enforcement officers in California. For example, on March 14, 2020 – a full two months *before* George Floyd's murder – Defendant had encouraged Carrillo, "*Start drafting that op. The one we talked about in December. I'ma green light some shit*." Carrillo replied to Defendant, "*Sounds good, bro!*"

Then, two days after shooting at the Third Precinct building, Defendant sent direct messages to Carillo urging, "*Go go go*," and "*Boog*." Carillo – having just murdered Officer Pat Underwood – coyly and tersely replied, "*Did"* (with a 'smiley-face' emoji) and "*Currently in hide mode*." Defendant then urged Carillo, "*Go for police buildings*," to which Carillo boasted, "*I did better lol* (laugh out loud)." The messages between these two BB members underscore that Defendant's sole motive for traveling to Minnesota was to target law enforcement and the government with criminal violence.

Further supporting this conclusion are Defendant's statements to a confidential human source (CHS) after he returned to Texas from Minneapolis. Defendant told the CHS that he had "mag-dumped" his AK-47 into the Third Precinct building, that he helped burn the building, and had participated in looting. And he told the CHS he was angry about fellow BB member Teeter's federal arrest – so much so that he threatened to start killing people. PSR, ¶ 19.

### III.   THE GUIDELINES ANALYSIS

The crime of Riot is a felony for which no guideline has been expressly promulgated. As a result, § 2X5.1 of the Sentencing Guidelines instructs "[i]f the offense

11

is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline." Under the facts of this case, the most analogous offense guideline is § 2K1.4 (titled *"Arson, Property Damage by Use of Explosives"*). Section 2K1.4 (a)(1) provides for a base offense level of 24 if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or *attempted destruction* of a dwelling, an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use.

Here, there concurrence between the government and Defendant that firing 13 rounds from an AK-47 point-blank into an obscured glass entryway of a police precinct created a substantial risk of death or serious bodily injury to any person. The parties further agree that a 3-level reduction applies for Defendant's acceptance of responsibility (PSR ¶¶ 37-38) and that his Criminal History Category is I. PSR, ¶ 45. The resulting advisory guidelines range is 37- 46 months imprisonment, and the offense calls for up to 3 years of supervised release and the statutory maximum sentence is set at 5 years. *See* 18 U.S.C. § 2101(a).

### IV.   ANALYSIS OF § 3553(a) FACTORS

The government seeks an upward variance to 52 months imprisonment based upon the statutory factors found at 18 U.S.C. § 3553(a). In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district

court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors."). Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

    A.    **Nature and Circumstances of the Offense**

Defendant's conduct was extraordinarily dangerous and was fueled by an extremist desire to foment civil war in the United States. His cold, intentional discharge of 13 rounds from an AK-47 directly into the burning Third Precinct structure merits an above-guidelines sentence. The conduct itself is egregious but so is his explanation for that conduct. Contrary to his fiction of wanting to preserve civil rights, protect protesters, and act as an intermediary, Defendant committed a grave act against the entire community, this country, and indeed, the Rule of Law. After "openly calling for a Second Revolutionary War," he exploited the tension in Minneapolis by attacking a symbol of government and those who serve it. It is abundantly clear that Defendant used the unrest to fuel the anarchy sought by the Boogaloo Bois. Importantly, his prior online statements evidence that his extremist views took root long before the civil unrest in the Twin Cities. The 2020 riots

simply afforded Defendant a unique opportunity to stoke hatred and give rise to the "Boogaloo".

### B.  History and Characteristics of the Defendant

Defendant obtained his high school diploma and attended – albeit briefly – community college in San Antonio, Texas (PSR ¶¶ 69-70). His work history shows inconsistent and unsteady employment over several years. PSR ¶¶ 71-72. Defendant's contacts with law enforcement have been limited but his involvement in this crime, combined with statements and his interactions with law enforcement in Texas, demonstrate that his behavior was motivated an extremist anti-government ideology. His home life was free of trauma, abuse, or financial difficulties (PSR, ¶¶ 48-63) but documented mental health issues and illegal drug use give this Court some context for Defendant's behavior. Regardless, these same factors should also give this Court pause in terms of assessing Defendant's ability and willingness to remain law-abiding in the future. PSR ¶¶ 65 – 67.

### C.  Promoting Respect for the Law and Providing Just Punishment for the Offense

Defendant stands before the court convicted of a federal offense involving an attack on society and its government. As such, promoting respect for the law is a paramount consideration in determining an appropriate sentence for Defendant. Just punishment for his dangerous and reckless conduct in the name of anarchy and his lack of respect for the law is properly reflected by an above-guidelines 52-month sentence.

    **D.**    **Deterrence**

Extremism – in whatever form it takes – is difficult to deter yet the effort must be made. General deterrence is necessary to impress upon violent extremists like Defendant that regardless of one's disagreements with policy or politics, violence designed to bring down the government will result in prison time, years of supervision, and a felony conviction. Individual deterrence is essential to returning Defendant to law-abiding behavior going forward. Society, and particularly those who serve it in uniform, can only hope that this will be the case with Defendant.

    **E.**    **Avoiding Unwarranted Disparities**

A 52-month sentence will not create an unwarranted disparity among similarly situated defendants. As this Court is aware, multiple other cases arising from the 2020 civil unrest have resulted in sentences near or below the government's requested 52-month sentence in this case. Those offenses – largely Arson or Conspiracy to Commit Arson – involved defendants with varying criminal histories who employed differing degrees of planning and preparation. None, however, blindly and intentionally discharged 13 rounds from high-powered assault rifle into a government building in which members of law enforcement and/or looters could have been present. And none did so as part of a calculated effort to spark a second civil war in the United States. But for Defendant's prompt acceptance of responsibility in this matter, the government would be seeking a statutory maximum sentence of 60 months.

### F.      Other Factors

While incarcerated and on supervised release, Defendant will live under conditions severely restricting his ability to harm the public and possess firearms. His federal probation officer can help Defendant maintain any required treatment or counseling regimens imposed by this Court that are designed to stabilize his behavior and temper his extremism after he is released from his term of incarceration.

### CONCLUSION

For all the reasons set forth above, the United States respectfully asks this Court to sentence Defendant Ivan Harrison Hunter to a term of imprisonment of 52 months, followed by three years of supervised release.

Dated: March 22, 2022                                      Respectfully submitted,

CHARLES J. KOVATS, JR.
Acting United States Attorney

*s/ Andrew R. Winter*

BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 232531